IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 6, 2014

**STATE OF TENNESSEE v. WILLIAM SCOTT ROSS**

**Appeal from the Criminal Court for Davidson County**
**No. 2012-D-2937     Cheryl A. Blackburn, Judge**

_____

**No. M2014-00459-CCA-R3-CD – Filed March 2, 2015**

_____

The Defendant-Appellant, William Scott Ross, pled guilty to one count of facilitation of a conspiracy to sell over seventy pounds of marijuana and one count of official misconduct. Pursuant to the plea agreement, he received an effective three-year sentence in the local corrections facility, suspended to supervised probation. After a hearing, the trial court denied the Defendant's request for judicial diversion. On appeal, the Defendant argues that the trial court erred in refusing to grant judicial diversion. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Sunny M. Eaton, Nashville, Tennessee, for the Defendant-Appellant, William Scott Ross.

Robert E. Cooper, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Victor S. Johnson, III, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On October 23, 2012, the Davidson County Grand Jury returned a sixty-one-count indictment against twenty-seven individuals, including the Defendant-Appellant, William Scott Ross. Specifically, the Defendant was charged in count 1 with conspiracy to sell 300 pounds or more of marijuana within 1,000 feet of a drug-free zone. He was also charged in count 32 with official misconduct for allegedly informing co-defendant Joseph Todd Travierso of an ongoing wiretap investigation involving Mark Christopher Gerald, another co-defendant.

-1-

Subsequently, the Defendant pled guilty to the lesser offense of facilitation of a conspiracy to sell over seventy pounds of marijuana, a Class C felony, and to official misconduct as charged, a Class E felony.[1] Pursuant to the plea agreement, the matter proceeded to a sentencing hearing on February 7, 2014 for the trial court to determine whether the Defendant should be granted judicial diversion.

At the hearing, the State entered the Defendant's presentence report into evidence without objection. According to the report, the forty-five-year-old Defendant had no prior criminal record and reported having "good" mental and physical health and a "very good" family relationship. The report further reflected that the Defendant reportedly began drinking alcohol when he was sixteen, that he began smoking marijuana when he was eighteen, and that he would smoke about two or three times a month until he quit. The State also called two witnesses.

Judge Casey Moreland of the Davidson County General Sessions Court testified that he supervised the Drug Court program and that the Defendant was the administrator. He explained that Drug Court provided eligible defendants with substance abuse treatment in lieu of incarceration. The Defendant's duties included overseeing the day-to-day operations of the program, screening potential participants, and occasionally acting as a case manager. Judge Moreland agreed that the position was funded by the Metro Nashville government and estimated that the Defendant was employed in this capacity for about ten years. He had first hired the Defendant to work for him as a probation officer and then promoted the Defendant to Drug Court administrator because of his competence and professionalism.

Judge Moreland said that in August 2012, the District Attorney's Office informed him that the Defendant had resigned. He was previously unaware of any misconduct on the Defendant's part and had never suspected the Defendant of using drugs. He agreed that the matter was secretly handled to insulate the Drug Court and that no one at the courthouse knew the reason for the Defendant's resignation.

On cross-examination, Judge Moreland testified that a few months after the Defendant's abrupt departure, each of the eleven Drug Court graduates thanked the Defendant for helping them. He agreed that the Defendant was respected by his colleagues and that the position was stressful due to its emotional nature. Judge

---

[1] We note that the Defendant did not include the transcript from his plea submission hearing in the record on appeal. We have carefully reviewed the appellate record and conclude that the indictment, the judgment sheet, the sentencing hearing transcript, and the presentence report are sufficient for a meaningful review of the issue on appeal. See State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012) (concluding that "[i]f . . . the record is adequate for a meaningful review, the appellate court may review the merits of the sentencing decision with a presumption that the missing transcript would support the ruling of the trial court").

Moreland said that the Defendant interacted with participants, their family members, and attorneys. To his knowledge, the Defendant's charges were unrelated to the position or to any Drug Court participants. He stated that the Defendant had been effective and "absolutely" able to do his job. In response to questioning from the trial court, Judge Moreland stated that he believed the Defendant learned of the wiretap investigation from testimony presented in open court.

Sergeant Brink Fidler of the Metropolitan Nashville Police Department ("MNPD") testified that he was the sergeant in charge of the 20th Judicial District Drug Task Force and that he participated in the instant investigation. He confirmed that the Defendant was present in General Sessions Court during a hearing in a separate case involving co-defendant Mark Gerald. At the proceeding, Detective Justin Fox testified that Gerald had been the subject of a prior wiretap investigation. Sergeant Fidler stated that, after the hearing, the Defendant learned from a hallway conversation with Detective Fox that Gerald was involved in the instant case. According to Sergeant Fidler, Detective Fox made "an offhand comment" to the Defendant stating, "[W]ell, yeah, we got [Gerald] jammed up in another one." He said that all the Drug Task Force members were aware that the Defendant was a court official.

Sergeant Fidler stated that, at the time, there was an active wiretap investigation of Gerald and other co-defendants, including Joseph Travierso and James Roberts. Because the Drug Task Force was intercepting Travierso's phone calls, Sergeant Fidler learned that the Defendant called Travierso after the hearing and asked to see him. Based on surveillance of Travierso's residence, officers observed the Defendant enter the home for a short time and then leave. Sergeant Fidler said that the Defendant had been to Travierso's house before as a narcotics customer, specifically for marijuana and cocaine. He stated that the Defendant was never charged for his personal drug use.

During this particular visit, officers intercepted a call between Travierso and Roberts shortly after the Defendant had left. Travierso told Roberts, the primary defendant in the case, that his contact had just left the house, that there was currently a wiretap of Gerald's phone, and that they needed to be cautious. During the call, Travierso and Roberts had discussed their options in detail, including killing the prosecutor in the case. As a result, Roberts got rid of his phone shortly before MNPD had planned on taking him into custody. Sergeant Fidler stated that Roberts was in Arizona at the time trying to obtain more marijuana, and the Drug Task Force had to "scramble" with the Phoenix authorities to locate and track Roberts. Sergeant Fidler said that after Roberts "dropped" his phone, MNPD could no longer intercept his calls and therefore lost all conversations between Roberts and his co-conspirators in Middle Tennessee and Arizona. He described the consequences of the Defendant's actions as follows:

You know, I think in any case where the defendants learn of any impending police action or investigation it jeopardizes the integrity of the investigation as well as the safety of me and my officers. And I don't take too kindly to that as well. Luckily the takedown went well. No one got hurt. But needless to say we were not real pleased with the actions of [the Defendant] based on all of that.

After the Defendant visited Travierso in person on this particular occasion, law enforcement and the prosecutor confronted the Defendant. Sergeant Fidler explained that they wanted to handle the matter quietly to protect the Drug Court, and the first step was to get the Defendant out of his position. Therefore, the Defendant was escorted to the District Attorney's Office on the ruse that he had to meet with the grand jury. Sergeant Fidler then showed the Defendant summaries of his calls with Travierso and photographs of him at Travierso's house. When given the option of being arrested that day or subsequently charged after his resignation, the Defendant chose to resign. He cooperated with the police and consented to a search of his vehicle and home.

On cross-examination, Sergeant Fidler testified that the Defendant was only involved in intercepted conversations with Travierso and that "they definitely had a history." He agreed that the majority of their conversations were about drug transactions in small amounts for personal use. He acknowledged that the conversations about harming the prosecutor were between Travierso and Roberts and that the Defendant was not involved in the larger drug trafficking conspiracy. Sergeant Fidler stated that Detective Fox would have been the Defendant's only source regarding the active wiretap investigation because the police would not discuss that information in a public hearing.

Upon questioning from the trial court, Sergeant Fidler said that he was not present at the prior hearing involving Gerald. He explained that Gerald, Travierso, and the Defendant all knew one another. He estimated that a few days had passed between the hearing, the Defendant's visit to Travierso, and the intercepted phone call between Travierso and Roberts. Sergeant Fidler testified that the police had to readjust everything on takedown and that their investigation was close to ending. He said that the takedown occurred within a week and that aspects of the investigation changed operationally. Sergeant Fidler agreed that the investigation could have been ruined if the co-conspirators had been alerted earlier regarding a possible wiretap.

After the State's proof, the defense called three witnesses. Brett Johnson, the Defendant's current boss, testified that he was the Regional Director of Tennessee Quick Cash. He said that the Defendant began working for him in December 2012 and that he was aware of the Defendant's charges. Mr. Johnson described the Defendant as an "[o]utstanding" and "very honest" employee whom everyone looked up to and who "[went] the extra mile." He stated that he trusted the Defendant to handle money and that

-4-

the Defendant earned $11.50 an hour.  Mr. Johnson identified a letter he wrote on the Defendant's behalf which was admitted into evidence.  In the August 19, 2013 letter, he described the Defendant as "an asset" to the company since the first day he was employed.  He stated that the Defendant took pride in his work and had a "positive outgoing personality" that was "contagious[.]"  Mr. Johnson further wrote that the Defendant would "always have a position on [his] team."

Sue Ross, the Defendant's mother, testified that she was aware of the facts and circumstances of her son's case.  She confirmed that the case received a lot of media attention and that it was an emotional time for their family.  Ms. Ross said that her family was close and would continue to support the Defendant.  She believed that these challenges motivated him to be a better person.  She stated that her son took responsibility for his mistakes and that he had many friends to support and help him in his struggles.  Ms. Ross said that the Defendant would move forward and continue to help others.  The record included eight letters of recommendation on the Defendant's behalf from family, friends, and employers.

The Defendant testified that he had known co-defendant Gerald since elementary school, although they had not been in contact for over twenty years.  He said that he met co-defendant Travierso ten years ago through a mutual friend at the gym.  He acknowledged that he occasionally purchased marijuana from Travierso and that he also purchased a small amount of cocaine at one point for a friend.  According to the Defendant, Gerald was a familiar presence in the courts and was frequently in trouble.  About a day after Gerald appeared in a hearing before Judge Moreland, the Defendant told Travierso to "stay away" from Gerald because Gerald was "trouble" and had his phone tapped.  The Defendant said he warned Travierso about Gerald because they "all grew up in the same area" and had mutual acquaintances.  He denied knowing that Travierso was involved in a larger drug operation or that Travierso would alert others about their conversation.

The Defendant said he purchased small quantities of drugs for personal use from Travierso about once or twice a month and occasionally went to Travierso's house every few months.  He said that the purpose of this particular visit was to obtain marijuana and that he was mistaken in assuming that Travierso was a small-time dealer.  He stated that he would not have associated with Travierso if he had known about Travierso's involvement in a larger drug operation.  The Defendant acknowledged that he shared information with Travierso that he had obtained from the hearing and from Detective Fox.  He stated that he did not realize there was anything illegal about what he shared, and he expressed remorse to the prosecutor and to the detectives as soon as they met with him. The Defendant said that he did not intend to impede a police investigation and that he had shared information about Gerald merely as casual gossip.  He testified that it "hit

[him] like a ton of bricks" to learn that he had endangered the lives of the police and of the prosecutor.

The Defendant stated that he was promoted from probation officer to Director of the Drug Court and that he felt comfortable in the position. He believed that he had helped and served other people, and he regretted disappointing his family, Judge Moreland, and the Drug Court participants. The Defendant said that he had been "reckless" and made "bad choices." As a result of his actions, he lost the job that he loved, his work friends, his reputation, and his wife. Although he was currently employed, his income was reduced by nearly fifty percent. Moreover, the Defendant served ninety days in the county jail after he surrendered his bond. He stated that he used his loss as an opportunity to learn and to persevere. He realized that he had "a real ego problem" and sought counseling to address his depression and other issues. Since his indictment, the Defendant found a new job and testified for the State in an unrelated fraud case. He believed that he was currently a better person than he was at the time of his indictment. He said that he was more at peace and wanted to continue to help others.

On cross-examination, the Defendant stated that he had purchased drugs from Travierso for about ten years. He acknowledged that he sometimes communicated with Travierso several times throughout the day. When questioned about their text messages, the Defendant explained that "medicine" referred to marijuana and "tabs" were Lortab pills. He could not explain why Travierso sent him a text message at one point with a name and what appeared to be a birth date, but he thought it may have been related to a friend of Travierso's who had been pulled over for driving without a license.

The call records reflected that at 3:00 p.m. on August 9, 2012, the day of the hearing involving Gerald, the Defendant texted Travierso, "Do you think you can swing by here today?" However, the Defendant testified that he did not recall that particular date. He admitted that he sent Travierso a text message at 1:25 p.m. the next day stating, "Update? Need medicine!" Travierso then responded that he had some and that the Defendant should not wait to visit. Two hours later, at 3:36 p.m., Travierso called Roberts about talking to his "inside boy." The Defendant conceded that he went to Travierso's house that afternoon to pick up drugs but denied that he was anyone's "inside boy." He recalled that Detective Fox had spoken about Gerald after the hearing, but he denied approaching Detective Fox or asking about Gerald. The Defendant stated that he was merely present when Detective Fox spoke to a co-worker about Gerald. He said that he never knew the identity of Travierso's supplier and that he did not know Roberts.

The Defendant denied that he sought out inside information or provided others with information that was not publicly available. He said that the extent of his conversation with Travierso was about whether Travierso associated with Gerald. He had mentioned a previous wiretap but was unaware of an ongoing wiretap. The

-6-

Defendant regretted the consequences of his words and the risk that law enforcement had faced. He testified that in hindsight, Travierso used him and obtained information in a passive manner.

Upon questioning from the trial court, the Defendant could not explain why he pled guilty to official misconduct. He stated that he had been most concerned with the conspiracy charge, which he considered to be more serious. He said that he had been self-important and was seeking to impress Travierso. The Defendant maintained that any discussion relating to Gerald had been offhanded "gossip[.]" The trial court noted for the record that the Defendant's drug screen was negative.

Following arguments, the trial court considered the required factors and denied the Defendant's request for judicial diversion based on the circumstances of the offense, the deterrence value to others, the interests of justice, and the attitude of law enforcement. The trial court stated, in pertinent part:

> The circumstances of the offense, this involves a very, very large conspiracy to distribute large amounts of medical marijuana in this community, and it was a rather large operation. I've heard testimony in bond hearings and plea agreement hearings on many of these individuals including Mr. Travierso. And they basically would bring marijuana into this community via I guess most of it was the post office. And they would -- and Mr. Gupton, who is another codefendant, would hire people to accept these packages. And it was a rather large scale operation that had been going on for a long time, people in -- it involved people in Las Vegas, Arizona, California, and it was bringing in large amounts of marijuana into the community. Now, [the Defendant] was only convicted of facilitation of that and conspiracy being what it is. He indicates he was mainly a drug user in that situation. And then the second part of this is the other count, and that's this official misconduct, which gives the Court a great deal of pause, that is, through what he says was a casual conversation with Mr. Travierso, which clearly as soon as that conversation went down he's on the phone with Mr. [Roberts] talking about the wiretap that is probably in existence. And as soon as that goes down, they lose the phone, the people in Arizona are trying to get all that stuff done, and it totally jeopardizes the operation that was winding down anyway. But it does have some great deal of effect. And as the detective testified, Sergeant Fidler, it put lives in jeopardy in terms of they had to proceed differently especially after the comments Mr. Travierso made over the telephone about killing [the prosecutor]. So this is not some small, little thing. This is a huge operation, like I said, that I heard a lot about, a lot about the wiretaps. So putting that -- that's the circumstances of the offense. And the information

-7-

-- and [the Defendant] says it was casual -- the information to Mr. Travierso had a great deal of effect on the effectiveness of the law enforcement in this case and possibly putting lives in jeopardy.

    . . . .

So it's not only the -- whether it will serve the interest of justice but it's also the attitude of law enforcement. And their attitude is obviously that this should be deterred because -- well, first of all, one has to keep in mind that wiretaps are a very, very secretive process. And the purpose for that is obviously you don't want people to know you're listening in on the conversations because then they would not do what they're doing.

    . . . .

I have considered all of these things. I just think the enormity of this case, it will not serve the interest of justice to have someone who has used their official capacity to interrupt the progress of this investigation and put lives in jeopardy that that's the appropriate thing to do in this case. So I'm not granting him judicial diversion.

The trial court sentenced the Defendant as a Range I, standard offender to concurrent sentences of one year for official misconduct and three years for the facilitation of conspiracy to sell over seventy pounds of marijuana. The court ordered the Defendant to serve his effective three-year sentence on supervised probation and imposed a fine of $2,000. The Defendant timely appealed the trial court's sentencing decision.

## ANALYSIS

The sole issue presented for our review is whether the trial court erred in denying the Defendant's request for judicial diversion. Tennessee Code Annotated section 40-35-313 outlines the requirements for judicial diversion. After a qualified defendant is either found guilty or pleads guilty, a trial court has the discretion to defer further proceedings and place that defendant on probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A). A qualified defendant is defined as a defendant who pleads guilty to or is found guilty of a misdemeanor or a Class C, D, or E felony; is not seeking diversion for a sexual offense as defined in the statute or a Class A or Class B felony; and does not have a prior conviction for a felony or a Class A misdemeanor. Id. § 40-35-313(a)(1)(B)(i). Upon the qualified defendant completing a period of probation, the trial court is required to dismiss the proceedings against him. Id. § 40-35-313(a)(2). The qualified defendant may then request that the trial court expunge the records from the criminal proceedings. Id. § 40-35-313(b).

Eligibility for judicial diversion does not entitle the defendant to judicial diversion as a matter of right. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Rather, the statute states that a trial court "may" grant judicial diversion in appropriate cases. See T.C.A. § 40-35-313(a)(1)(A). In deciding whether a qualified defendant should be granted judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the interests of the public as well as the defendant. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing Parker, 932 S.W.2d at 958; State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993) (citation omitted), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000)). The trial court may consider the following additional factors: "'[the defendant's] attitude, behavior since arrest, prior record, home environment, current drug usage, emotional stability, past employment, general reputation, marital stability, family responsibility and attitude of law enforcement.'" State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993) (quoting State v. Markham, 755 S.W.2d 850, 852-53 (Tenn. Crim. App. 1988) (citations omitted)). The trial court must weigh all of the factors in determining whether to grant judicial diversion. Electroplating, Inc., 990 S.W.2d at 229 (citing Bonestel, 871 S.W.2d at 168). Finally, "a trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration." State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997) (citing Bonestel, 871 S.W.2d at 168).

Prior to State v. Bise, 380 S.W.3d 682 (Tenn. 2012), the grant or denial of judicial diversion was left to the sound discretion of the trial court. See, e.g., State v. Harris, 953 S.W.2d 701, 705 (Tenn. Crim. App. 1996); State v. Kyte, 874 S.W.2d 631, 634 (Tenn. Crim. App. 1993). So long as the court adhered to the requirements above, this court would conclude that the trial court did not abuse its discretion if the record contained "'any substantial evidence to support the refusal.'" State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (quoting State v. Hammersley, 650 S.W.2d 352, 356(Tenn. 1983)).

In State v. King, 432 S.W.3d 316, 324-25 (Tenn. 2014), the Tennessee Supreme Court held that the abuse of discretion standard of review accompanied by a presumption of reasonableness, as delineated in Bise and its progeny, applied to appellate review of a trial court's decision to grant or deny judicial diversion. However, the Court explained that the application of the Bise standard of review did not abrogate the common law factors for judicial diversion:

[W]hen the trial court considers the Parker and Electroplating factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision. Although the trial court is not required to recite all of the Parker and Electroplating factors in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the Parker and Electroplating factors in rendering its decision and that it identified the specific factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors.

If, however, the trial court fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard, which merely looks for 'any substantial evidence' to support the trial court's decision, is not appropriate. . . . In those instances, appellate courts may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration.

King, 432 S.W.3d at 328-29 (internal citations omitted) (footnote omitted).

Here, the Defendant asserts that the trial court failed to adequately explain its reasons for denying judicial diversion or why the factors supporting denial outweighed the positive factors in favor of diversion. He contends that the trial court placed undue emphasis on the circumstances of the offense despite evidence that he was not involved in the larger drug trafficking operation. Moreover, the Defendant argues that the trial court erroneously found that his actions hampered police effectiveness given that the investigation was nearly completed. He maintains that the trial court unreasonably based its decision on the interests of justice and the attitude of law enforcement while disregarding the positive factors such as the Defendant's amenability to correction, his lack of a criminal record, his consistent employment, and his good social history. Finally, the Defendant argues that he is an appropriate candidate for diversion because he immediately regretted his conduct and took steps to rectify the situation, including cooperating with law enforcement and voluntarily seeking counseling.

The record reflects that trial court considered the appropriate factors, specifically identified the relevant factors, and placed on the record its reasons for denying judicial diversion. Therefore, we apply a presumption of reasonableness to the trial court's sentencing decision and must uphold the denial "so long as there is any substantial evidence to support the trial court's decision." King, 432 S.W.3d at 327.

-10-

The trial court noted several factors that favored a grant of judicial diversion in this case. It found that the Defendant was amenable to correction because he was employed and seeking treatment. It considered the Defendant to have a good reputation and social history, as evidenced in the multiple letters of support. The court stated that the deterrence value to the Defendant was positive because there was no indication that the Defendant would be involved in a similar situation again. The court acknowledged that the Defendant had worked hard and was no longer abusing drugs.

Despite the positive factors in the record, the trial court concluded that the Defendant was not a proper candidate for diversion due to the circumstances of the offense, the deterrence value to others, the interests of justice, and the attitude of law enforcement. While considering the circumstances of the offense, the court noted that the Defendant was primarily a drug user rather than an active participant in the larger conspiracy. Nevertheless, the court expressed great concern regarding the Defendant's conviction for official misconduct. Though the Defendant testified that his conversation with Travierso was casual, the court emphasized the detrimental consequences of the Defendant's actions and the manner in which his conduct impeded a complex investigation. The court noted that law enforcement relied heavily on wiretapping in the instant case, and it found that the Defendant shared information that endangered the lives of others. Because wiretap investigations required secrecy, the court concluded that it would serve the interests of justice and the attitude of law enforcement to deter others from engaging in similar conduct. Accordingly, the trial court denied the Defendant's request for judicial diversion.

There is ample evidence in the record to support the trial court's denial of diversion. Although the Defendant described his actions as reckless and expressed his remorse, the evidence shows that his conduct impeded a complicated investigation that involved multiple states and multiple defendants. On August 9, 2012, the Defendant received information during a court hearing that the police had previously intercepted the phone calls of co-defendant Gerald. After the hearing, the Defendant learned of an active wiretap involving Gerald from Detective Fox. Although the Defendant and Travierso had often communicated by phone, the Defendant contacted Travierso on that particular occasion and asked to see him in person. The day after the hearing, the Defendant visited Travierso at his home where the police could not monitor their conversation. Shortly after the Defendant left Travierso's house, Travierso called Roberts to alert him of an ongoing wiretap of Gerald's phone. They discussed their options during a lengthy conversation, and Travierso stated that he would kill the prosecutor if necessary. Roberts, the primary target of the investigation, was in Arizona at the time and immediately stopped using his wiretapped phone. Therefore, the police could no longer intercept Roberts's calls and had to completely readjust their plan to take him into custody.

Based on the record, we conclude that the trial court did not err in denying judicial diversion, and the Defendant is not entitled to relief.

## **CONCLUSION**

Upon review, we affirm the judgment of the Davidson County Criminal Court.

_____
CAMILLE R. McMULLEN, JUDGE